UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HMV INDY 1, LLC, | ) |
| | ) |
| *Plaintiff,* | ) |
| | )   No. 1:19-cv-01148-JMS-TAB |
| *vs.* | ) |
| | ) |
| HSB SPECIALTY INSURANCE COMPANY, | ) |
| | ) |
| *Defendant.* | ) |

## ORDER

Plaintiff HMV Indy 1, LLC ("HMV") owns and operates three solar energy generation projects located in Indianapolis, Indiana ("the Solar Projects"). The Solar Projects are located on the rooftops of three buildings owned by Duke Realty Limited Partnership ("Duke"). On April 24, 2017, a fire occurred at one of the buildings and caused substantial damage to the roof and solar equipment on the roof. After investigating the cause, HMV shut down the Solar Projects to alleviate the risk of another fire and repaired all of the property damaged by the fire. HMV sought coverage under an insurance policy issued by Defendant HSB Specialty Insurance Company ("HSB") for property damage, business income loss, and other covered losses ("the Policy"). When HSB refused to pay over $1.4 million that HMV contends is covered under the Policy, HMV initiated this litigation. HMV and HSB have both filed Motions for Partial Summary Judgment, which are now ripe for the Court's consideration. [Filing No. 86; Filing No. 91.]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d

903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

- 3 -

### A.    The Solar Projects

HMV built the Solar Projects on the rooftops of three buildings in Indianapolis owned by Duke and located at 8258 Zionsville Road ("Building 98"), 53555 West 76th Street ("Building 87"), and 4945 West 86th Street ("Building 129") (collectively, "the Buildings"). [Filing No. 91-5 at 1.]  HMV leases space for the Solar Projects on the roofs of the Buildings pursuant to a February 26, 2014 Solar Power Rooftop Lease Agreement ("the Lease Agreement") it entered into with Duke for each of the three Buildings.  [Filing No. 91-5 at 1; Filing No. 91-5 at 8-51.]

The Solar Projects were constructed simultaneously in 2014 pursuant to a March 4, 2014 Construction Services Agreement ("the Construction Agreement") between HMV and Inovateus Solar, LLC ("Inovateus"), the general contractor.  [Filing No. 91-5 at 2; Filing No. 91-5 at 53-114.] The Solar Projects are all of the same type, design, material, manufacture, and construction. [Filing No. 91-2 at 23-24; Filing No. 91-5 at 56; Filing No. 91-5 at 139.]  Inovateus engineered and built each of the Solar Projects using the same methods and material, including electrical connectors.  [Filing No. 91-5 at 2.]  The electrical connectors connect the string of solar panels to combiner boxes, and are called "pigtail" connections.  [Filing No. 91-5 at 2.]  There are thousands of pigtail connections on the Solar Projects.  [Filing No. 91-5 at 2.]

### B.    The Policy

On August 5, 2016, HSB issued the Policy to HMV.  [Filing No. 18-1 at 3.]  The Policy provides certain "Property All Risk Coverage" for the Solar Projects, including coverage for property damage, business income loss, serial losses, extra expenses, and professional fees.  [Filing

No. 18-1 at 23-29.]  HMV is an additional named insured under the Policy.  [Filing No. 18-1 at 69.][1]

### C.     The Fire at Building 98

On April 24, 2017, a fire occurred on the roof of Building 98.  [Filing No. 91-5 at 3.]  The fire destroyed a large part of Building 98's roof, along with hundreds of solar panels and wiring, cable trays, combiner boxes, and racking.  [Filing No. 91-5 at 3.]  All of the solar arrays on Building 98 were shut down as a result of the fire.  [Filing No. 91-5 at 3.]

### D.     HMV's Notification to HSB and HSB's Initiation Investigation of the Fire

HMV first notified HSB of the fire on April 26, 2017.  [Filing No. 91-5 at 3.]  HSB assigned the claim to its internal adjuster, Travis Henderson.  [Filing No. 86-5 at 4-5.]  Mr. Henderson called HMV the same day he received notification of the fire, and spoke with HMV's main contact regarding the claim, Gavin Cornwell, on April 27, 2017.  [Filing No. 86-5 at 4.]  During the call, Mr. Henderson acknowledged receipt of the claim, developed additional information, determined that he would need to retain a fire investigator, and retained Patrick Masterson of EFI Global Inc. ("EFI").  [Filing No. 86-5 at 4-5.]  Mr. Henderson scheduled Mr. Masterson's investigation for May 2, 2017.  [Filing No. 86-5 at 5.]  Mr. Masterson conducted his first site inspection that day, and reported to Mr. Henderson the next day that there was "evidence of arcing (electrical fault activity)," and that "[t]he origin of the fire appears to be approximately 2 ½ feet away from a combiner module."  [Filing No. 91-1 at 9.]

Also on May 3, Mr. Henderson called Mr. Cornwell to discuss the findings of the investigation to that point and to request an estimate of repairs.  [Filing No. 86-5 at 6.]  On May

---

[1] The specific Policy provisions at issue in this litigation are numerous, and will be set forth in the appropriate sections of the Discussion, below.

18, 2017, having not received a repair estimate, Mr. Henderson again contacted Mr. Cornwell and learned that HMV was still working on getting an estimate from contractors.  [Filing No. 86-5 at 6.]

        **E.**        **HMV's Investigation of the Fire**

Meanwhile, HMV retained several professionals to investigate the fire, including its operations and maintenance contractor, Miller Bros. Solar, LLC ("Miller Bros."), and its engineering expert, Kirk Kondos, P.E.  [Filing No. 91-5 at 3.]  Miller Bros. provided a preliminary report on May 12, 2017, in which it noted that solar equipment damaged by the fire was removed from the rooftop of Building 98 and that other, non-damaged portions of the Solar Project on Building 98 also "had to be removed from the roof in order for the roof to be properly repaired." [Filing No. 91-5 at 116-136.]  Specifically, solar arrays 7, 8, and 9 on Building 98 were damaged by the fire, and portions of solar arrays 4, 5, and 6 on Building 98 were not directly damaged by the fire but had to be removed from the roof so that the roof could be repaired.  [Filing No. 91-1 at 152.]  In all, Miller Bros. estimated that approximately 200 solar panels were damaged in the fire and would have to be replaced.  [Filing No. 86-3 at 22.]  HMV forwarded the report from Miller Bros. to HSB the same day it received the report.  [Filing No. 91-5 at 116.]

On June 9, 2017, several entities including HMV and Duke inspected the site of the fire with their own engineers.  [Filing No. 91-5 at 4.]  There are at least two dozen combiner boxes on each of the three Solar Projects, which were all installed in the same way by Inovateus and its subcontractors.  [Filing No. 91-5 at 4.]  The engineers concluded that the fire originated in pigtail electrical connectors near Combiner Box B-1 on Building 98.  [Filing No. 91-5 at 4.]  The conclusion that the fire had originated in a pigtail connection to a combiner box raised an immediate concern that there could be issues with all of the Solar Projects.  [Filing No. 91-5 at 4.]

Accordingly, HMV expanded its inspection to all of the pigtail connectors on Buildings 87, 98, and 129.  [Filing No. 91-5 at 4.]  That inspection revealed that many of the pigtail connectors on the Solar Projects were exhibiting various stages of overheating, arcing, melting, and burning. [Filing No. 91-5 at 4.]

Because the discovery of failing connectors on all three Buildings posed an immediate and obvious risk of another fire at the Solar Projects, HMV shut down the Solar Projects.  [Filing No. 91-5 at 4.]  Additionally, Duke sent a June 14, 2017 "cease and desist" letter to HMV, requesting that HMV temporarily shut down the arrays on all three Buildings.  [Filing No. 91-1 at 24.]  In the letter to an HMV representative, Duke's Assistant Vice President of Property Management wrote:

> The cause of the fire, as determined by a consensus of experts on Friday June 9, 2017, was the cabling connections from the solar panels to the combiner boxes. Additionally, multiple cabling connections in areas separate from the fire affected areas were found in faulty condition.  We have serious concerns about the cabling methods and installation practices completed during the solar field install…. [Duke] is sending this letter to formally notify [HMV] to cease and desist operation of all three solar arrays until a plan of action is received.  We expect this plan of action to explain your understanding of the cause of the fire and the changes that will be made to avoid any further catastrophic failures.

[Filing No. 91-1 at 24.]

HMV complied with Duke's cease and desist request.  [Filing No. 86-1 at 78-79.]  HMV also arranged another site inspection on August 22, 2017 to further investigate the extent of overheating, arcing, burning, and melting in other electrical connectors.  [Filing No. 91-5 at 4.] This investigation revealed widespread connector installation errors.  [Filing No. 91-5 at 4; Filing No. 91-5 at 139-42.]

### F.    HSB's Initial Coverage Position

On June 15, 2017, HMV sent HSB an invoice from Miller Bros. for $109,257.34.  [Filing No. 91-5 at 149-51.]  On June 26, 2017, HMV's counsel emailed Mr. Henderson at HSB and

requested that HSB provide a letter "formally accepting tender and acknowledging coverage" under the Policy. [Filing No. 91-1 at 22-23.] HMV's counsel attached Duke's June 14, 2017 letter to HMV to the email. [Filing No. 91-1 at 24.]

Also on June 26, 2017, Mr. Henderson forwarded the June 26, 2017 email from HMV's counsel to Mr. Masterson, and asked Mr. Masterson whether "the damages warranted the shutdown of these other 2 buildings." [Filing No. 91-1 at 31.] Mr. Masterson responded:

> As I understand it, it was determined that the fire was the result of a high resistance connection between the solar panel(s) and the combiner box. Evidence was also found of what appeared [to] be high resistance connections in other areas which appeared to be at the incipient stages of failure. Since all the locations have the same type of connections, the decision was made to shut them all down so as to prevent another fire.

[Filing No. 91-1 at 31.]

One day after Mr. Masterson's response, HSB hired an outside accounting expert, Stephen Gregoire of Meaden & Moore, "to calculate a loss of income" for HMV. [Filing No. 91-1 at 35.] Mr. Henderson wrote in his engagement letter to Mr. Gregoire:

> There was an electrical arcing event that lead to a fire. The BI [Business Income] should be calculated for building 98 only. The landlord demanded the insured shut down other buildings['] arrays as a preventative measure.

[Filing No. 91-1 at 35.] Mr. Henderson's supervisor, Ricky Burke, also noted in the claim file that "[B]usiness income loss at [Buildings 87 and 129] are not the direct result of a covered cause of loss and will not be part of our liability." [Filing No. 91-1 at 59.]

On June 27, 2017, HSB sent a letter to HMV stating that "[t]he damages sustained to the solar equipment" on Building 98 were "a covered loss under the [Policy]." [Filing No. 91-1 at 68.] HSB indicated that it would cover certain "indirect loss related to the sale of electrical power to the local Utility Company," but concluded that it did not "have any liability for the fire damage sustained to the roof" of Building 98 because HMV did not own the building and did "not have an

insurable interest" in the roof.  [Filing No. 91-1 at 69.]  HSB also stated that it did "not have any liability for the resulting business interruption" losses at Buildings 87 and 129.  [Filing No. 91-1 at 72.]

### G.   HSB's Continued Investigation of the Claim

HSB used its in-house engineering team to investigate HMV's claim, and one of its internal engineers, Linkesh Diwan, developed a "list of documents" to help HSB assess the damage to the Solar Projects.  [Filing No. 91-1 at 75.]  Mr. Diwan sent the list to his supervisor, Michael Roy, who recommended that Mr. Diwan "[i]nclude [a] request for any reports related to the system as a whole," rather than just the burned portion of Building 98.  [Filing No. 91-1 at 75.]  Mr. Roy asked:

> Did someone come an[d] inspect the undamaged part of the array?  What were the findings?  What corrective actions, if any, were made to prevent similar events in the future?

[Filing No. 91-1 at 75.]  HSB incorporated that suggestion, and a suggestion to request information regarding the "thermal damage to the pigtails at other locations" in the Solar Projects, and sent the final list to HMV.  [Filing No. 91-1 at 79.]

HSB also hired an outside engineering expert, Envista, Inc. ("Envista"), to provide an opinion on the connector failings at the Solar Projects.  [Filing No. 91-1 at 81-82.]  Additionally, HSB internally reassigned the claim from Mr. Henderson to another adjuster, Steve Smith.  [Filing No. 91-1 at 85.]  HMV's counsel sent a letter to Mr. Smith on July 14, 2017 in which it described why it "disagree[d] with a number of the coverage positions taken by HSB" in its June 27, 2017 letter.  [Filing No. 91-1 at 87.]  Among other things, HMV's counsel wrote:

> The Policy defines "Covered Property" as, *inter alia*, "Real property, including improvements and betterments, owned by you or in which you have an insurable interest."  (Policy, Section G(5)(a)(1)(a).)  Indiana law unambiguously provides that "[b]oth the lessor and the lessee have an insurable interest in the property which is the subject of the lease." *Erie-Haven, Inc. v. Tippmann Refrigeration Const.*, 486

N.E.2d 646, 650 (Ind. Ct. App. 1985).  Because HMV has an insurable interest in the building itself, Building 98 is "Covered Property" under the Policy.

[Filing No. 91-1 at 87-88.]   HMV's counsel also stated that "Section E(9) of the Policy, Serial Losses, applies to provide coverage for the Business Income and Extra Expense losses on Buildings 87 and 129." [Filing No. 91-1 at 88.]

HMV's counsel also sent HSB a link to an online "Box" site, where HMV periodically uploaded documents requested by HSB during the claims handling process.  [Filing No. 91-1 at 3.]  Mr. Smith and his supervisor, Mr. Burke, exchanged emails regarding the Lease Agreement, and both concluded that the roof was not covered property because HMV had no insurable interest in the roof.  [Filing No. 91-1 at 91-92.]  On July 19, 2017, Mr. Smith noted in the claim file:

> Discussed the claim with Ricky Burke.  We agree that the landlord[']s building is not covered property nor is contingent BI property.  For period of restoration measurement we agree that it should be the time it would have taken to make repairs to the covered equipment absent any of the roof damage.

[Filing No. 91-1 at 56.]

### H.     Further Inspection of the Solar Projects

On August 1, 2017, HMV sent a Notice of Claim and Spoliation Notice to several entities including Inovateus.  [Filing No. 91-1 at 98-103.]  HMV's counsel sent a copy to Mr. Smith at HSB the same day, stating:

> [W]e are noticing up potentially responsible parties and are going to give them an opportunity to inspect all three buildings before we proceed to replace all of the connectors.  HMV's goal is to mitigate its business interruption damages and get those buildings back in operation as soon as reasonably possible.  Also, I'm sure you understand that although HMV has noticed these parties of potential claims against them, HMV's position regarding HSB's obligations remains as stated in my letter of July 14, 2017.

[Filing No. 91-1 at 94.]  In response to the Notice, Mr. Smith and Paul Mullin of Envista inspected the Solar Projects and observed "arcing" in electrical connectors "other than the original fire" during their inspection.  [Filing No. 91-1 at 105.]

In August 2017, HSB issued an internal Large Loss Notice for HMV's claim.  [Filing No. 91-1 at 109-14.]  In the Large Loss Notice, HSB estimated that "275 solar panels, as well as solar panel racks, cables, connections, and an estimated 6-10 out of 30 combiner boxes were destroyed in the fire" at Building 98, and that "another 922 panels and their equipment had to be removed to accommodate the roof repairs" on Building 98.  [Filing No. 91-1 at 114.]  HSB acknowledged that there were "multiple Quick Disconnects with arcing damage," but did not mention the Serial Losses provision of the Policy.  [Filing No. 91-1 at 114.]  HSB also noted that "subrogation does not appear to be likely at this time."  [Filing No. 91-1 at 114.]  The Large Loss Notice was circulated internally at HSB to numerous individuals, and one HSB employee asked: "Are the Combiner Boxes Pigtail Cable Quick Disconnects all made by one manufacturer and therefore we should be on the alert for that type in our book?"  [Filing No. 91-1 at 110.]  In response, Mr. Diwan stated: "[T]here is evidence of similar arcing in other points in this array which may lead to similar losses going forward; I would feel more comfortable if the cause can be identified and rectified."  [Filing No. 91-1 at 109.]

On October 6, 2017, Mr. Mullin issued a report to HSB in which he noted that he witnessed various instances of "melted," "damaged," "disengaged," and "hot" connectors across the three Solar Projects.  [Filing No. 91-1 at 117-18.]  Mr. Mullin included in his report photographs of "eroded" and "deformed" connectors and connectors displaying "advanced melting" and those "with bubbling in [the] center of connector from internal heat."  [Filing No. 91-1 at 124-26.]  Mr. Mullin attributed the various failings to "[h]igh resistance connections" between the two halves of

each connector.  [Filing No. 91-1 at 118.]  Mr. Mullin noted that "high resistance connections will cause heating and can cause series arcing and the type of failures observed in this system," and that "[t]he damage to the PV [photovoltaic] connectors was consistently in the center of the connector where the [two halves] engage each other." [Filing No. 91-1 at 118.]  Mr. Mullin found this evidence significant because it "implies that the same person making these field connections…may have been consistent in improperly making the field connections" across the Solar Projects, and because it "shows the progression of a high resistance connection in this type of connector causing overheating and eventual failure."  [Filing No. 91-1 at 118.]  Mr. Mullin concluded that connectors which did not have "elevated temperatures" on the Solar Projects "should be replaced as a preventative measure during maintenance of the array" and "would not be considered failed at this point."  [Filing No. 91-1 at 119.]

## I.    Further Communications Between HMV and HSB Regarding Coverage

On October 27, 2017, HSB responded to HMV's counsel's June 14, 2017 letter, stating that "a Covered Cause of Loss ha[d] occurred to the solar array at building 98."  [Filing No. 91-1 at 133.]  HSB approved the original invoice from Miller Bros. that HMV had submitted for $109,257.34 of work related to Building 98.  [Filing No. 91-1 at 138.]  HSB maintained, however, that HMV did "not have an insurable interest in the roof " of Building 98.  [Filing No. 91-1 at 134.]  HSB did not mention the *Erie-Haven* case, but simply stated that "the building is not owned by [HMV]."  [Filing No. 91-1 at 134.]  As to the failing connectors across the Solar Projects, HSB stated that each "would be separate occurrences" under the Policy that would not exceed the separate deductible for each occurrence.  [Filing No. 91-1 at 140.]

In response to HSB's October 27, 2017 letter, HMV's counsel wrote to HSB on November 27, 2017 stating:

> Ultimately, HSB took 14 weeks to tell us that its coverage position remains
> unchanged from its initial letter dated June 27, 2017.  Further, despite taking all this
> time to respond, HSB completely failed to address any of the issues raised in my
> letter including, without limitation, the disputes we have regarding "Covered
> Property" under the Policy and HMV's Business Income and Extra Expense losses
> related to Building 87…and Building 129….

[Filing No. 91-1 at 142.] On December 4, 2017, HMV provided additional records to HSB through

the "Box" site, including financial records, repair invoices, and energy production data from the

Solar Projects.  [Filing No. 91-1 at 4.]  HMV responded to follow-up questions from HSB

throughout January, February, and March 2018, and HMV's counsel hired an accounting expert,

Jeffrey Katz of BDO USA LLP ("BDO"), to provide an opinion on the total measure of HMV's

damages.  [Filing No. 91-1 at 4.]  BDO issued a preliminary analysis on May 23, 2018, opining

that HMV had sustained $2,116,861.00 in losses as of the date of the preliminary analysis.  [Filing

No. 91-1 at 4.]

On June 2, 2018, Mr. Smith sent three letters to HMV's counsel – one letter for each

Building.  [Filing No. 91-1 at 146-53.]  As to Building 98, HSB wrote: "In our previous letter dated

October 27, 2017, we stated our position for the claim on this building and there is no change in

that position."  [Filing No. 91-1 at 151.]  For Building 129, HSB agreed that 13 connectors on the

Building "had been destroyed or were in the beginning stages of arcing," and another 13 connectors

"had been identified as overheating."  [Filing No. 91-1 at 147.]  Regarding Building 87, HSB

acknowledged that 9 connectors "had been identified as overheating."  [Filing No. 91-1 at 149.]

HSB asserted, however, that all of the faulty connectors on Buildings 87 and 129 were "individual

occurrences" that did not "exceed the Policy Deductible of $10,000."  [Filing No. 91-1 at 148-50.]

HSB did not mention the Serial Losses provision of the Policy.  [Filing No. 91-1 at 148-50.]

HMV's counsel responded to the three letters in a June 19, 2018 letter, attaching the

preliminary analysis from BDO and demanding payment of the full $2,116,861.00 in damages.

[Filing No. 91-1 at 175-93.]  HMV's counsel noted that HSB had failed "to even address HMV's

Serial Losses analysis," and, on the issue of whether the roof of Building 98 was considered

"Covered Property" under the Policy, HMV's counsel reasserted that, under the *Erie-Haven* case,

HMV had an insurable interest in the roof of Building 98.  [Filing No. 91-1 at 176-77.]  HMV

stated "HSB's assertion that HMV does not have an insurable interest in [Building 98] remains

unexplained," and wrote:

> [E]ven if the roof of Building 98 was not "Covered Property," HSB would still be
> liable under the Policy for the removal and replacement of the portions of arrays 4,
> 5 and 6 and the attendant business income loss because the removal and
> replacement costs are an "Extra Expense" under the Policy.

[Filing No. 91-1 at 176 n. 2 (emphasis omitted).]  HMV's counsel also rejected "HSB's efforts to

improperly and arbitrarily" reduce the Period of Restoration for Building 98, and requested

payment of the undisputed amounts owed for Building 98.  [Filing No. 91-1 at 178.]

Shortly thereafter, on June 25, 2018, Mr. Smith sent an email to HSB's damages expert,

Mr. Gregoire, stating:

> The rebuild invoices are for both the Covered Loss on Arrays 7, 8, & 9 as well as
> excluded work on Arrays 4, 5, & 6.  Miller Bros-Solar reported that they have no
> breakdown on specific Arrays.  We are accepting 50% of the work on the rebuild
> of the Arrays, or 57 days.  The total days for the Period of Restoration is 136 days
> from the loss date or ending on September 8, 2017.

[Filing No. 91-1 at 195.]  In response to the email, Mr. Gregoire provided Mr. Smith with a

business interruption calculation on July 20, 2018 that included "a period of restoration of 136

days," which was then offset by a 30-day "waiting period" in the Policy.  [Filing No. 91-1 at 213.]

Mr. Gregoire determined that "[t]he calculated amount for the arrays & combiner boxes impacted

by the incident totaled $95,246 for the 106 [days] considered in the calculation."  [Filing No. 91-

1 at 213.]  Based on that calculation, HSB informed HMV on July 20, 2018 that it would be paying

Business Income in the amount of $95,246.00 and Property Damages in the amount of $535,634.24 on HMV's claim. [Filing No. 91-1 at 5.]

### J.  HMV's and HSB's Final Coverage Positions

Although HSB's "investigation, adjustment and coverage decision-making efforts had concluded and [it] had already issued its coverage position," HSB hired outside counsel, Edward Gleason, before making the $95,246 and $535,634.24 payments to HMV. [Filing No. 91-1 at 5; Filing No. 91-1 at 313.] After retaining Mr. Gleason, HSB did not change any of its coverage positions and paid out $95,246 in Business Income losses for Building 98 and $541,078.24[2] in Property Damages for Building 98. [Filing No. 91-1 at 5.]

Mr. Gleason then provided a September 28, 2018 letter to HMV in which he defended HSB's coverage decisions but added the 60-day Extended Period of Restoration to HMV's Business Income loss under the Policy. [Filing No. 91-1 at 267.] HSB then recalculated its Business Income payment to include the additional 60 days, and the claim notes indicate that Mr. Smith was authorized to offer to settle with HMV for the additional amount owing of $71,143 for the Extended Period of Restoration for Building 98 in exchange for HMV's release of its entire claim for Business Income losses under the Policy. [Filing No. 91-1 at 39.] That offer was conveyed to HMV, and HMV rejected the offer. [Filing No. 91-5 at 5.] On March 4, 2019, HSB paid the additional $71,143 in Business Income loss for Building 98 without any concession by HMV. [Filing No. 91-5 at 5.] HSB indicated to HMV that it would not be paying any additional amounts. [Filing No. 91-1 at 38.]

---

[2] The extra $5,444 in Property Damage was for a Miller Bros. invoice that HSB requested and HMV provided in late July 2018. [Filing No. 91-1 at 5.]

### K.     The Lawsuit

HMV initiated this lawsuit on March 21, 2019, [Filing No. 1], and filed the operative

Amended Complaint on April 9, 2019, [Filing No. 18].  HMV asserts claims for breach of contract

and breach of the duty of good faith and fair dealing, and seeks a declaratory judgment "resolving

the parties' dispute and declaring the parties' rights and responsibilities with respect to the Policy,"

damages, punitive damages, attorneys' fees and costs, and interest.  [Filing No. 18 at 14-15.]

### III.
### DISCUSSION

### A.     Applicable Insurance Law

When the Court exercises diversity jurisdiction over an action, as it does here, it is "obliged

to apply state law to the substantive issues in the case." *Lodholtz v. York Risk Servs. Grp., Inc.*,

778 F.3d 635, 639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  The

parties do not dispute that Indiana law governs this action.  Accordingly, this Court must "apply

the law that would be applied by the Indiana Supreme Court." *Lodholtz*, 778 F.3d at 639.  "If the

Indiana Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the

state's intermediate appellate courts as authoritative, unless there is a compelling reason to think

that the state supreme court would decide the issue differently." *Id.*

The Indiana Supreme Court has summarized the well-established standards for interpreting

insurance policies in Indiana as follows:

> Interpretation of an insurance policy presents a question of law that is particularly
> suitable for summary judgment.  It is well settled that where there is ambiguity,
> insurance policies are to be construed strictly against the insurer and the policy
> language is viewed from the standpoint of the insured.  This is especially true where
> the language in question purports to exclude coverage.  Insurers are free to limit the
> coverage of their policies, but such limitations must be clearly expressed to be
> enforceable.  Where provisions limiting coverage are not clearly and plainly
> expressed, the policy will be construed most favorably to the insured, to further the
> policy's basic purpose of indemnity.  Where ambiguity exists not because of

extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the insured for purposes of summary judgment.

*State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012) (quotations and citations omitted).

The Court will "construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs." *West Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 598 F.3d 918, 921 (7th Cir. 2010) (quotation and citation omitted) (applying Indiana law). Words are given their ordinary meaning, though where ambiguity exists the policy is read "strictly against the insurer." *Id.* Ambiguous language in the policy is resolved in favor of the insured as long as such an interpretation harmonizes the provisions of the contract as a whole. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 578 (Ind. 2013). Failure to define a term in the policy "does not necessarily make that term ambiguous, nor does a simple disagreement about the term's meaning." *Id.* (citation omitted). "Rather, an ambiguity exists where the provision is susceptible to more than one reasonable interpretation." *Id.* (citation and quotation omitted). Where the terms of an insurance policy are clear and unambiguous, the Court "will apply the plain and ordinary meaning of the terms and enforce the contract according to its terms…. [T]he parties' intent is to be determined by reviewing the language contained within the four corners of the contract, and parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence. Extrinsic evidence cannot be used to create an ambiguity." *Bar Plan Mut. Ins. Co. v. Likes Law Office, LLC*, 44 N.E.3d 1279, 1285 (Ind. Ct. App. 2015) (quotations and citations omitted).

**B.    Breach of Contract Claim**

HMV's breach of contract claim focuses on HSB's failure to provide coverage under the Policy for three types of loss: (1) the costs associated with repairing the roof of Building 98 and the parts of the Solar Project housed on Building 98; (2) to the extent not covered as direct costs of repair, the Business Income loss for the time it took Duke to fix the roof of Building 98; and (3) Business Income loss for the time it took to make repairs to Buildings 87 and 129, and the portion of Building 98 not damaged by the fire.  The Court addresses each type of loss in turn.

*1.    Costs Associated With Repairing the Roof of Building 98*

The existence and extent of coverage for the costs associated with repairing the roof of Building 98 and the parts of the Solar Project housed on Building 98 that were damaged in the fire center on two issues: (a) whether the roof is Covered Property under the Policy; and (b) whether the Policy covers the cost of removing, storing, and reinstalling arrays 4, 5, and 6.  The parties dispute both of these issues, and the Court discusses them below.

a.    Whether the Roof is Covered Property

**i.    Relevant Policy Provisions**

**A.    Coverage**
This [Policy] provides insurance for a Covered Cause of Loss as defined in A.1. below.  In the event of a Covered Cause of Loss, we will pay for loss as described in A.2. below.

**1.    Covered Cause of Loss**
Covered Cause of Loss for this [Policy] means all risks of direct physical loss or damage not otherwise excluded.  Such risks must result in an event that:

**a.**    Occurs during the Policy Period; and

**b.**    Causes direct physical loss or damage to "covered property," or "contingent property" or "utility property."

[Filing No. 18-1 at 23 (emphasis in original).]

- 18 -

**F.     Additional Conditions**
The following conditions apply in addition to the Common Policy Conditions:

                    *                    *                    *

**12.     Projects You Have Agreed to Insure**
If, prior to the inception of this [Policy], you have agreed in writing to purchase insurance for a project or joint venture that includes the interests of third parties, we will consider your insurable interest in such project to be the entire amount for which you have agreed to purchase insurance….

[Filing No. 18-1 at 43 (emphasis in original).]

**G.     Definitions**

                    *                    *                    *

**5.     "Covered Property"**
**a.**     "Covered property means the following:
(1)     Unless otherwise specified in the Declarations:
(a)     Real property, including improvements and betterments, owned by you or in which you have an insurable interest….

[Filing No. 18-1 at 45 (emphasis in original).]

**ii.     The Parties' Arguments**

HSB argues in support of its Motion for Partial Summary Judgment that HMV does not have an insurable interest in the roof of Building 98, so it is not considered "covered property" under the Policy. [Filing No. 87 at 26-27.] HSB contends that the Lease Agreement only required HMV to purchase property insurance for the full replacement cost of its own solar generation equipment, but not for Duke's buildings, that HMV was not even required to name Duke as an additional insured under the Policy, and that Duke was required to purchase its own property insurance. [Filing No. 87 at 27.] It notes that the Policy's provision regarding "Projects You Have Agreed to Insure" indicates that HSB will consider HMV's insurance interest in projects like the

Solar Projects to be "the entire amount for which [HMV] agreed to purchase insurance." [Filing No. 87 at 27.] It asserts that the Lease Agreement and the Policy must be read together, and that the *Erie-Haven* case does not support the notion that the roof of Building 98 is "covered property" because "under Indiana law, a proper assessment of coverage begins with an examination of the words of the applicable policy provisions, not with case law." [Filing No. 87 at 27-28.]

HMV argues in response and in support of its Motion for Partial Summary Judgment that it has an insurable interest in the roof of Building 98 under Indiana law. It relies on *Erie-Haven*, which it asserts stands for the proposition that both a lessor and a lessee have an insurable interest in the property that is the subject of a lease. [Filing No. 92 at 38-39.] HMV contends that the Court cannot consider the Lease Agreement because it is inadmissible parol evidence, and that the terms of the Policy are clear and indicate that HMV has an insurable interest in the roof of Building 98. [Filing No. 92 at 40-41.] It argues that the "Projects You Have Agreed to Insure" provision only applies to a "project or joint venture that includes the interests of third parties," and it is not in a joint venture with Duke with respect to the Solar Projects and Duke has no ownership or other interest in the Solar Projects. [Filing No. 92 at 41-42.] HMV argues that even if that provision did apply, the full amount for which HMV agreed to purchase insurance still exceeds the amount that HSB has refused to pay in this case. [Filing No. 92 at 42.] It also notes that the Lease Agreement provides that Duke shall purchase insurance for "the full replacement cost of [Building 98]," but that this does not preclude HMV from also having an insurable interest in the roof. [Filing No. 92 at 42-43.] Finally, HMV argues that there is no support for HSB's argument that the Court should not consider case law in determining whether the roof of Building 98 is Covered Property under the Policy. [Fling No. 92 at 43.]

In its response to HMV's Motion for Partial Summary Judgment and its reply supporting its own motion, HSB acknowledges that *Erie-Haven* indicates that a lessee can have an insurable interest in leased property under Indiana law, but asserts that HMV does not have such an interest under the circumstances presented here. [Filing No. 93 at 19-20.] It argues that *Erie-Haven*, and another *Erie-Haven* opinion issued by the Indiana Court of Appeals, support the contention that "HSB's insurable interest interpretation considered the lease terms as well, including how the insurance provisions of the lease set out [HMV's] and [Duke's] obligations to purchase insurance, and how the terms of the [Policy] actually point back to the lease in the 'Projects You have Agreed to Insure' provision as controlling the insurable interest issue." [Filing No. 93 at 21-22.] HSB reiterates its argument that the Court's analysis should begin with the terms of the Policy, and argues that the parol evidence rule does not prohibit the Court from considering the Lease Agreement. [Filing No. 93 at 22-23.] HSB argues that the "Projects You Have Agreed to Insure" provision applies to all projects, and not just "joint" projects. [Filing No. 93 at 24-25.] It also contends that even if the Court finds that HMV had an insurable interest in the roof of Building 98, HMV has not properly shown what the amount of that coverage should be and has merely "subtract[ed] the total amount of the Business Income loss it has claimed from the amount HSB already paid for Business Income loss directly resulting from and solely attributable to the fire." [Filing No. 93 at 26.] It notes that the amounts HMV seeks for Business Income loss at Building 98 "remain the subject of HSB's request for partial summary judgment on [HSB's] 'direct result of' and 'solely attributable to' defense," which HMV has not responded to or otherwise addressed. [Filing No. 93 at 26.]

HMV reiterates many of its arguments in its reply brief, stating that both it and Duke have an insurable interest in the roof under Indiana law because it derives a benefit from Building 98's

existence, and would suffer a loss from its destruction.  [Filing No. 94 at 13-14.]  HMV asserts

that the Policy does not contain any restriction that HMV must be required to insure the roof of

Building 98 in order for it to be considered Covered Property.  [Filing No. 94 at 15.]  HMV again

argues that the "Projects You Have Agreed to Insure" provision does not apply because the word

"project" means only those projects that include the interests of third parties, and Duke is not

involved in the Solar Projects.  [Filing No. 94 at 16-17.]

**iii.    Discussion**

The Policy provides that "Covered Property" is, among other things, any real property in

which HMV has an insurable interest.  [Filing No. 18-1 at 45.]  Under Indiana law, both a lessor

and a lessee can have "an insurable interest in the property which is the subject of the lease." *Erie-*

*Haven*, 486 N.E.2d at 650.  While often the entity that has an insurable interest in property also

holds title to that property, holding title is not a requirement for having an insurable interest.

*United Farm Bureau Mut. Ins. Co. v. Blanton*, 457 N.E.2d 609, 611 (Ind. Ct. App. 1983).

Accordingly, more than one party may have an insurable interest in leased property – *i.e.*, both the

lessor and the lessee. *Erie-Haven*, 486 N.E.2d at 650.  The focus under Indiana law is whether the

party claiming to have an insurable interest "obtains a benefit from the existence of the property

or would suffer a loss from destruction of the property." *Id.*  Here, both are true – HMV benefited

from the roof of Building 98 because it used the roof to house its solar equipment, and it suffered

a loss when the roof was damaged from the fire because it could no longer house its solar

equipment there.

HSB reads too much into the Lease Agreement and the Policy.  First, the fact that the Lease

Agreement only requires HMV to purchase insurance for its solar equipment and not for Duke's

buildings is irrelevant.  The Lease Agreement does not preclude HMV from purchasing insurance

- 22 -

for the roof, and does not explicitly state that HMV does not have an insurable interest in the roof of Building 98.[3]  Nor does the Policy limit Covered Property to property for which HMV is required to procure insurance.  Further, the fact that Duke is not an additional insured under the Policy is irrelevant.  The Policy does not provide, anywhere, that HMV only has an insurable interest in property that is owned by it or entities that are named as additional insureds.  Indeed, the Policy specifically contemplates that "Covered property" includes property not owned by HMV.  [*See* Filing No. 18-1 at 45 (defining "Covered Property" as "Real property… owned by you *or in which you have an insurable interest*") (emphasis added).]

Finally, HMV need not rely on the "Projects You Have Agreed to Insure" provision in seeking coverage for the roof of Building 98.  That provision limits the amount of insurance that the insured may receive for "a project or joint venture that includes the interests of third parties" for which the insured has "agreed in writing to purchase insurance" before the inception of the Policy.  The Court finds that the phrase "that includes the interests of third parties" in the "Projects You Have Agreed to Insure" provision modifies both "project" and "joint venture."  It is undisputed that Duke does not have an interest in the Solar Projects, so the "Projects You Have Agreed to Insure" provision does not limit HMV's coverage for the roof of Building 98.

The Court **GRANTS** HMV's Motion for Partial Summary Judgment to the extent it finds that the roof of Building 98 is "Covered Property" under the Policy, and **DENIES** HSB's Motion for Partial Summary Judgment to the extent it seeks the opposite finding.  Because the Court finds

---

[3] Because the Lease Agreement does not indicate that HMV does not have an insurable interest in the roof of Building 98, and therefore does not contradict the Policy's terms, the Court need not consider HMV's argument that it should not consider the Lease Agreement because it is inadmissible parol evidence.  *See Northstar Partners v. Marsh Supermarkets, LLC*, 2004 WL 1784903, at *3 (S.D. Ind. 2004) (finding there was no need to resort to parol evidence where contract was unambiguous and the dispute could be "resolved within the four corners of the lease document, seasoned by a little common sense").

that the roof of Building 98 is "Covered property" under the Policy, it continues on to consider the

proper amount of coverage for the roof.

b.     <u>Costs For Removing, Storing, and Reinstalling Arrays 4, 5, and 6 on Building 98</u>

i.     **Relevant Policy Provisions**

**A.**     **Coverage**

\*            \*            \*

**2.**     **Coverages Provided**

\*            \*            \*

[E]ach coverage will apply only to the direct result of a Covered Cause of Loss.  For each coverage, we will pay only for that portion of the loss, damage, or expense that is solely attributable to the Covered Cause of Loss.

\*            \*            \*

**f.**     **Extra Expense**
We will pay the reasonable and necessary "extra expense" to operate your business during the "period of restoration."

[Filing No. 18-1 at 23-24 (emphasis in original).]

**G.**     **Definitions**

\*            \*            \*

**8.**     **"Extra Expense"** means the additional cost you incur to operate your business over and above the cost that you normally would have incurred to operate your business during the same period had there been no Covered Cause of Loss.

[Filing No. 18-1 at 46 (emphasis in original).]

ii.     **The Parties' Arguments**

HSB does not address the cost of moving, storing, and reinstalling arrays 4, 5, and 6 on

Building 98 in its opening brief.  [*See* Filing No. 87.]

In its Motion for Partial Summary Judgment, HMV argues that it is entitled to the costs associated with removing, storing, and reinstalling arrays 4, 5, and 6 because it was necessary to move the arrays in order to facilitate the repairs to the roof of Building 98.  [Filing No. 92 at 45.] HMV points to a letter from Mr. Smith to HMV's counsel, in which Mr. Smith states: "We have also determined that Solar Arrays 4, 5, and 6 were undamaged and were removed and reinstalled at the request of Duke to facilitate their roof repairs."  [Filing No. 92 at 45 (citing Filing No. 91-1 at 152).]  HMV notes that HSB denied coverage for moving, storing, and reinstalling arrays 4, 5, and 6 because it took the position that the roof of Building 98 was not "Covered Property," but that since it is "Covered Property" those expenses are covered under the Policy.  [Filing No. 92 at 46.]  HMV argues further that even if the roof of Building 98 is not Covered Property, the expenses associated with removing, storing, and reinstalling arrays 4, 5, and 6 are covered under the Policy's "Extra Expense" provision because shutting down and moving the arrays was a "direct result" of the fire.  [Filing No. 92 at 46-47.]

In its response/reply, HSB argues that arrays 4, 5, and 6 were not directly damaged by the fire, and so their removal was not a direct result of the fire.  [Filing No. 93 at 27.]  It contends that Duke's request that arrays 4, 5, and 6 be removed from the roof of Building 98 to facilitate repairs was "as much of a cause of [HMV's] claimed Extra Expenses as [the] fire."  [Filing No. 93 at 27.] HSB argues that HMV has not shown that the expenses associated with arrays 4, 5, and 6 were the "direct result of" and "solely attributable to" the fire.  [Filing No. 93 at 28.]  It asserts that the "antecedent defective construction, which itself came first and caused the fire," also caused the removal of arrays 4, 5, and 6.  [Filing No. 93 at 27-28.]  Finally, HSB argues that HMV can only recover under the "Extra Expense" provision if the roof of Building 98 is Covered Property in the first instance and, HSB claims, it is not.  [Filing No. 93 at 28.]

HMV argues in its reply that "[t]he only reason the undamaged portions of arrays 4, 5, and 6 were temporarily removed was because the fire damaged the roof and it could not be fixed without moving the equipment."  [Filing No. 94 at 19 (emphasis omitted).]  HMV contends that the "Extra Expense" provision does not require that those expenses be a "direct result of" and "solely attributable to" the fire, but rather covers the additional costs incurred by HMV to operate its business had there been no fire.  [Filing No. 94 at 19-20.]

### iii.    Discussion

The Policy insures a "Covered Cause of Loss," and HSB has admitted that the fire is a "Covered Cause of Loss" and has paid certain amounts related to the fire.  The "Coverages Provided" section of the Policy states that each coverage listed – including coverage for "Extra Expense" – applies only "to the direct result of a Covered Cause of Loss," and that HSB "will pay only for that portion of the loss, damage, or expense that is solely attributable to the Covered Cause of Loss."  [Filing No. 18-1 at 23.]  Accordingly, the threshold question is whether the costs associated with removing, storing, and reinstalling arrays 4, 5, and 6 were incurred as a "direct result" of the fire, and whether those costs are "solely attributable to" the fire.

The evidence indicates that arrays 4, 5, and 6 were removed at Duke's request, to facilitate the repairs to Building 98's roof.  [*See, e.g.*, Filing No. 91-1 at 152.]  HSB argues that the removal was really attributable to Duke's request, but this reads the Policy language too technically.  Arrays 4, 5, and 6 were removed (and, consequently, stored and reinstalled) as a direct result of the fire. Without the fire, the roof would not have been damaged, and the removal (and consequent storage and reinstallation) of the arrays would not have been necessary to allow for repairs on the roof. Further, the costs of removing, storing, and reinstalling arrays 4, 5, and 6 were solely attributable to the fire.

HSB attempts to dig into another layer of the events that led to HMV's loss by arguing that the removal, storage, and reinstallation were also attributable to the defective construction that then led to the fire. But this argument is a slippery slope. For example, if an automobile policy covered loss that was solely attributable to automobile accidents, but included coverage for the cost of towing a damaged car, the coverage for towing would never kick in if the Court adopted HSB's reading. Using HSB's logic, the cost of towing the car would not be covered because there was a cause of the accident itself (*e.g.*, the brakes not working on the car), and a cause of the necessity to tow the car (*e.g.*, the police ordering that the car be towed). Similarly, here, the fire had a cause (defective connectors), and the arrays were removed, stored, and reinstalled because Duke requested their removal to facilitate repairs. HSB's interpretation is untenable, and does not give the Policy's terms their plain and ordinary meaning.

The Court finds that removing, storing, and reinstalling arrays 4, 5, and 6 were the direct result of the fire, and that the costs associated with doing so were solely attributable to the fire. Accordingly, the "Coverages Provided" section applies to the costs associated with removing, storing, and reinstalling arrays 4, 5, and 6, and the "Extra Expense" provision is triggered. It provides that the Policy covers reasonable and necessary additional costs HMV incurred to operate its business over and above the costs HMV "normally would have incurred to operate [its] business during the same period had there been no [fire]." [Filing No. 18-1 at 46.] There can be, and there is, no dispute that fixing the roof of Building 98 was necessary to operate the Solar Project housed there, and that HMV would not have had to remove, store, or reinstall arrays 4, 5, and 6 but for the fire.

Because the fire is a Covered Cause of Loss, the need to remove, store, and reinstall arrays 4, 5, and 6 was the direct result of the fire, the costs associated with doing so were solely

attributable to the fire, and those costs are covered under the "Extra Expense" provision of the Policy.[4]  The Court **GRANTS** HMV'S Motion for Partial Summary Judgment to the extent that it finds that the costs of removing, storing, and reinstalling arrays 4, 5, and 6 on the roof of Building 98 are covered under the Policy, and **DENIES** HSB's Motion for Partial Summary Judgment to the extent that it seeks a finding that those costs are not covered under the Policy.

> 2. *Business Income Loss For the Period of Time It Took to Repair the Roof of Building 98*

The parties' dispute regarding coverage for Business Income loss during the time it took to repair the roof of Building 98 relates to the time period of loss that is covered – or the correct "Period of Restoration."  Specifically, HSB has maintained that because HMV did not have an insurable interest in the roof of Building 98, the time Duke took to repair the roof should be subtracted from the Period of Restoration.  The Court discusses the issue below.

> a. Relevant Policy Provisions

**A.    Coverage**

> \*            \*            \*

> **2.    Coverages Provided**
> This section lists the coverages that may apply in the event of a Covered Cause of Loss… [E]ach coverage will apply only to the direct result of a Covered Cause of Loss.  For each coverage, we will pay only for that portion of the loss, damage, or expense that is solely attributable to the Covered Cause of Loss.

> \*            \*            \*

---

[4] HMV also argues that the cost of removing, storing, and reinstalling arrays 4, 5, and 6 is covered as "Property Damage."  [*See* Filing No. 92 at 46 (HMV arguing that HSB is "liable for all costs associated with repairing the Property Damage to the roof of Building 98, including the costs to move arrays 4, 5, and 6").]  Because arrays 4, 5, and 6 were not damaged in the fire, the Court finds that coverage for the cost of removing, storing, and reinstalling arrays 4, 5, and 6 falls under the "Extra Expense" provision.

    e.  **Business Income**
      (1)  We will pay your actual loss of "business income" during the "period of restoration" that results directly from the necessary total or partial interruption of your business.
      (2)  We will also pay any necessary expenses you incur during the "period of restoration" to reduce the amount of loss under this coverage.  We will pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

[Filing No. 18-1 at 23 (emphasis in original).]

  **G.**  **Definitions**

        \*      \*      \*

    **20.**  **"Period of Restoration"**
      a.  "Period of restoration" means the period of time that begins at the time of the Covered Cause of Loss and continues until the earlier of:
      (1)  The date the direct physical damage to "covered property," "contingent property" or "utility property" is repaired or replaced; or
      (2)  The date on which such damage could have been repaired or replaced with the exercise of due diligence and dispatch,
      plus the number of days, if any, shown in the Declarations for Extended Period of Restoration.

[Filing No. 18-1 at 49.]

  **Property All Risk Coverage Part Declarations**

  **Coverage Limits**

The limits below are part of and not in addition to the Policy Limit shown above.  All limits shown below are on a per Occurrence basis unless otherwise noted:

Extended Period of Restoration   60 Days.

[Filing No. 18-1 at 6 (emphasis in original).]

b.    The Parties' Arguments

HSB does not raise any arguments regarding the Period of Restoration in its Motion for Partial Summary Judgment.  [*See* Filing No. 87.]

In its Motion for Partial Summary Judgment, HMV argues that HSB has breached the Policy by failing to pay for its Business Income loss incurred during the time it took Duke to repair the roof of Building 98.  [Filing No. 92 at 43-45.]  HMV contends that HSB has conceded that the fire was a Covered Cause of Loss that occurred during the Policy Period, and that it caused physical loss and damage to the roof of Building 98 and the solar equipment housed there.  [Filing No. 92 at 44.]  HMV asserts that HSB deducted the time that it took to repair the roof of Building 98 from the Period of Restoration based on HSB's contention that the roof is not Covered Property under the Policy.  [Filing No. 92 at 45.]  It notes that the Period of Restoration should be from April 26, 2017 through December 13, 2017, and that HSB only paid $166,389 of the $492,962 in total Business Income losses during that period for Building 98.  [Filing No. 92 at 44-45.]  HMV requests that the Court enter summary judgment in its favor for the outstanding $326,573.  [Filing No. 92 at 45.]

In its response/reply brief, HSB argues that even if HMV had an insurable interest in the roof of Building 98, HMV has not sustained its burden of proof for the amount due because it has merely "subtract[ed] the total amount of the Business Income loss it has claimed from the amount HSB already paid for Business Income loss directly resulting from and solely attributable to the fire."  [Filing No. 93 at 26.]  HSB also notes that the amounts HMV seeks for Business Income loss related to Building 98 "remain the subject of HSB's request for partial summary judgment on its 'direct result of' and 'solely attributable to' defense,…a defense [HMV] did not respond to or otherwise address in its Opening Brief."  [Filing No. 93 at 26.]

- 30 -

HMV does not address the Period of Restoration issue in its reply brief.  [*See* Filing No. 94.]

c.   <u>Discussion</u>

HSB's sole justification for not including the time it took Duke to repair the roof of Building 98 in the Period of Restoration is that the roof is not considered Covered Property under the Policy. [Filing No. 91-2 at 19.]  But the Court has found that the roof is Covered Property.  Accordingly, HMV is entitled to its Business Income loss for the entire Period of Restoration, which is the period from April 26, 2017 – the date HMV's Business Income loss from the fire began – to December 13, 2017 – the date the roof repairs were complete and the solar equipment was reinstalled.  [Filing No. 91-5 at 163.][5]  To the extent the $326,573 amount HMV seeks is subject to HSB's additional arguments regarding the Business Income loss being the "direct result of" and "solely attributable to" the fire, the Court discusses those issues below.  The Court **GRANTS** HMV's Motion for Partial Summary Judgment to the extent it finds that HMV is entitled to recover its Business Income loss for the period from April 26, 2017 to December 13, 2017, and **DENIES** HSB's Motion for Partial Summary Judgment to the extent it seeks the opposite finding.

*3.   Business Income Loss for Buildings 87 and 129 and Undamaged Portions of Building 98*

a.   <u>Relevant Policy Provisions</u>

**Special Terms and Conditions**

*          *          *

This policy excludes all costs rendered necessary by defects of material workmanship, design plan, or specification, and should damage occur to any portion of the Property Insured containing any of the said defects, the cost of

---

[5] The Policy provides an Extended Period of Restoration which increased the Period of Restoration by 60 days.  [Filing No. 18-1 at 6.]  This additional 60 days is not at issue, because HSB has already paid HMV $71,143 in Business Income loss related to Building 98.  [Filing No. 91-5 at 5.]

replacement or rectification which is hereby excluded is only that cost which would have been incurred if replacement or rectification of the insured property had been put in hand immediately prior to the said damage.

[Filing No. 18-1 at 4 (emphasis in original).]

A.    **Coverage**
This [Policy] provides insurance for a Covered Cause of Loss as defined in A.1. below.  In the event of a Covered Cause of Loss, we will pay for loss as described in A.2. below.

1.    **Covered Cause of Loss**
Covered Cause of Loss for this Property All Risk Coverage means all risks of direct physical loss or damage not otherwise excluded. Such risks must result in an event that:

a.    Occurs during the Policy Period; and

b.    Causes direct physical loss or damage to "covered property," or "contingent property" or "utility property."

2.    **Coverages Provided**
This section lists the coverages that may apply in the event of a Covered Cause of Loss.  Each coverage is subject to a specific limit as shown in the Declarations.  See Limits of Insurance C.2. for details.

[E]ach coverage will apply only to the direct result of a Covered Cause of Loss.  For each coverage, we will pay only for that portion of the loss, damage, or expense that is solely attributable to the Covered Cause of Loss.

[Filing No. 18-1 at 23 (emphasis in original).]

C.    **Limits Of Insurance**
Any payment made under this [Policy] will not be increased if more than one insured is shown in the Declarations or if you are comprised of more than one legal entity.

1.    **Property All Risk Limit**
The most we will pay for loss, damage, or expense arising from any "one occurrence" is the amount shown as the Property All Risk Limit in the Declarations.

  **2.**  **Coverage Limits**

    **a.**  The limit of your insurance under each of the coverages listed in Coverages A.2. from loss, damage, or expense arising from any "one occurrence" is the amount indicated for that coverage in the Declarations.

[Filing No. 18-1 at 33 (emphasis in original).]

**D.**  **Deductibles**

  **1.**  **General Information about Deductibles**

    **a.**  We will not pay for loss, damage, or expense until the amount of the covered loss, damage, or expense exceeds the applicable deductibles indicated in the Declarations.  We will then pay the amount of loss, damage, or expense in excess of the applicable deductible amounts, subject to the applicable limits indicated in the Declarations.

    **b.**  As respects any "one occurrence," the base deductibles described in 2. below shall apply.  However, if one or more of the other deductibles described in 3. below are applicable to the loss, they shall apply in place of the base deductibles.

  **2.**  **Base Deductibles**
The following deductibles apply to all loss, damage or expense covered under this All Risk Property Coverage, except as indicated in section 3. Other Deductibles.

    **a.**  **Property Damage**
All loss damage or expense will be subject to the Property Damage deductible, except as indicated in b. and c. below.

    **b.**  **Business Income**
Loss, damage or expense covered under Business Income coverage and the Business Income portions of other coverages will be subject to the Business Income deductible.

     *    *    *

  **4.**  **Application of Deductibles**
    **a.**  **Dollar Deductibles**
We will not pay for loss, damage, or expense resulting from any "one occurrence" until the amount of loss, damage, or

expense exceeds the applicable deductible or deductibles shown in the Declarations….

[Filing No. 18-1 at 35-36 (emphasis in original).]

**E.   Loss Conditions**

\*            \*            \*

**9.   Serial Losses**

**a.**   This provision applies if:
(1)   The Covered Cause of Loss results from a defect in design, material, manufacture, or construction; and
(2)   You have other "covered property" of the same type, design, material, manufacture, or construction.

**b.**   When this provision applies:
(1)   You agree promptly to examine such other "covered property" to determine if the same defect is present, inform us of the findings, and repair and, as far as practicable, eliminate the defect or replace defective parts;
(2)   We will not pay for your expenses to comply with (1) above.
(3)   As respects any other loss, damage or expense resulting from the same defect, we will not pay the full amount of the loss.  Instead, our payment after applying the applicable deductible, will be calculated according to the following scale:
80% of the second loss;
60% of the third loss;
40% of the fourth loss;
20% of the fifth loss;
0% of any subsequent losses.

[Filing No. 18-1 at 39 (emphasis in original).]

**G.   Definitions**

**1.   "Accident"**

**a.**   "Accident" means a fortuitous event that causes direct physical damage to "covered equipment."  The event must be one of the following:

- 34 -

> (1)    Mechanical breakdown, including rupture or bursting caused by centrifugal force;
>
> (2)    Artificially generated electrical current, including electric arcing, that damages electrical devices, appliances, or wires;
>
> *         *         *
>
> (6) Bursting, cracking, or splitting.
>
> **b.**    None of the following is an "accident," however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected:
>
> *         *         *
>
> (2) Any gradually developing condition;
>
> *         *         *
>
> (5) Misalignment, miscalibration, tripping off-line, or any condition that can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.
>
> *         *         *
>
> **19.**    **"One Occurrence"** means the sum total of all loss or damage sustained by you arising out of or caused by one discrete event of direct physical loss or damage, regardless of the number of locations affected.

[Filing No. 18-1 at 44; Filing No. 18-1 at 49 (emphasis in original).]

### b.    The Parties' Arguments

HSB argues in support of its Motion for Partial Summary Judgment that Business Income loss attributable to the areas of Building 98 not affected by the fire and to Buildings 87 and 129 are not the direct result of or solely attributable to the fire at Building 98, so do not fall within the Policy's coverage. [Filing No. 87 at 23-26.] HSB again argues that HMV had no insurable interest in the roof of Building 98, so Business Income loss related to the portion of Building 98's roof that were not damaged by the fire is not covered under the Policy. [Filing No. 87 at 26-28.] It further

contends that each instance of electrical arcing from the defective construction of electrical connectors at Buildings 87 and 129 are separate and discrete events, subject to separate Property Damage and Business Income loss deductibles.  [Filing No. 87 at 28-32.]  HSB asserts that the Policy's "one occurrence" definition indicates that each arcing incident was a separate occurrence and that there were "as many as 27 separate and discrete arcing accidents and resulting damage, which again did not occur simultaneously, suddenly all at once, and not at the same location but, rather, at two of [HMV's] three solar generation projects."  [Filing No. 87 at 29.]  HSB argues that the overheating of defectively installed connectors is not an "accident" as defined in the Policy and, even if it were, each instance of overheating would be a separate occurrence subject to a separate deductible.  [Filing No. 87 at 32-33.]

In its response and in support of its Motion for Partial Summary Judgment, HMV argues that the Policy's Serial Losses provision applies to loss related to portions of Building 98's roof that were not damaged by the fire and to Buildings 87 and 129.  [Filing No. 92 at 26-35.]  Specifically, HMV notes that the fire was a "Covered Loss" under the Policy, that the solar equipment on Buildings 87, 98, and 129 is "Covered Property," that HMV promptly examined the undamaged portion of Building 98's roof and Buildings 87 and 129 to determine if the same defect that caused the fire was present, that HMV promptly informed HSB of the findings from its investigation, and that HMV replaced all of the improperly installed connectors throughout the Solar Projects.  [Filing No. 92 at 26-29.]  HMV argues that "[t]he obvious purpose of the Serial Losses provision is to prevent further covered losses," and that it "fulfilled its obligations under the provision, and [HSB] directly benefitted from that."  [Filing No. 92 at 31-34.]  HMV asserts that the Serial Losses provision does not require that other loss, damage, or expenses occur simultaneously, suddenly, or all at once, that loss must occur at the same location, or that one loss

must cause the next loss to trigger coverage.  [Filing No. 92 at 35-36.]  It notes that HSB's argument that faulty installation of the connectors is not covered by the Policy is a new position, and that "coverage under the Policy does not turn on 'the initiating, proximate cause' of the insured's damages or 'the chain of causation' leading to the insured's damages, as now claimed by [HSB]." [Filing No. 92 at 36-37.]

In its response/reply, HSB argues that the Serial Losses provision is not a coverage granting provision, but instead sets forth certain conditions precedent that an insured must satisfy when there is a covered loss.  [Filing No. 93 at 7.]  It asserts that the only covered cause of loss was the fire, but the fire did not cause damage to other parts of Building 98 or to Buildings 87 or 129. [Filing No. 93 at 9-10.]  HSB contends that the Serial Losses provision "serve[s] to reduce [its] liability for recurring resulting Covered Causes of Loss from the same defect by stepping down the percentage payment of insurance proceeds HSB would have to make in response to each instance of recurring resulting Covered Cause of Loss from the same defect."  [Filing No. 93 at 11.]  It notes that the Serial Losses provision "serves the dual purpose of motivating insureds like Plaintiff to address and eliminate known defects before their coverage runs out entirely, while at the same time limiting HSB's liability for each recurring resulting Covered Cause of Loss from the same defect."  [Filing No. 93 at 12.]  HSB argues that only excluded defects were found at Building 87, and notes that HMV is seeking 100% coverage for losses at Buildings 87 and 129 despite the Policy's step-down percentages specified in the Serial Losses provision.  [Filing No. 93 at 14.]  It asserts that "the first one of the 13 arced electrical connectors [HMV] and its expert identified at Building 129 would be treated as the second Covered Cause of Loss overall under the 'Serial Losses' condition (the first being the fire at Building 98, which HSB already paid at 100%, after applying deductibles and other terms), and be addressed at 80% after applying the deductible as

provided for in the 'Serial Losses' condition; the second of the 13 arc-damaged connectors at Building 129 would be treated as the third overall Covered Cause of Loss under the 'Serial Losses' condition and be addressed at 60% after applying the deductible; and so on, until the sixth arc-damaged connector at Building 129, when the 'Serial Losses' condition would be exhausted." [Filing No. 93 at 14.]  HSB reiterates its arguments that each instance of arcing is a separate occurrence subject to a separate deductible, and that the arcing is not the direct result of or solely attributable to a Covered Cause of Loss.  [Filing No. 93 at 16-19.]

In its reply, HMV argues that the plain language of the Serial Losses provision is dispositive, and that HMV complied with all of that provision's requirements.  [Filing No. 94 at 2-3.]  HMV notes that the Policy provides that the titles given to paragraphs "do not grant, define or restrict coverage," and that the Covered Cause of Loss – here, the fire – "triggers the insurer and the insured to look at Section E to see if there are any additional conditions applicable to that Covered Cause of Loss."  [Filing No. 94 at 3.]  HMV goes on to reiterate many of its arguments in support of its contention that the Serial Losses provision covers loss related to the undamaged portions of Building 98 and Buildings 87 and 129.  [Filing No. 94 at 5-12.]

c.   <u>Discussion</u>

The Court has already determined that the fire was a Covered Loss under the Policy, and that HMV had an insurable interest in the roof of Building 98.  Further, there is no requirement under the Policy that the arcing on the undamaged portions of Building 98 or on Buildings 87 and 129 be the "direct result of" or "solely attributable to" the fire.  Those requirements – "direct result of" and "solely attributable to" – relate to losses in connection with a Covered Cause of Loss – the fire.  The Serial Losses provision, as described in more detail below, applies where there is a Covered Cause of Loss and other covered property has a similar condition such that additional

- 38 -

Covered Causes of Loss might eventually occur.  The Serial Losses provision is triggered when there is covered property of a similar type, design, material, manufacture, or construction as the property that was damaged by a Covered Cause of Loss.  Loss from the same defect as the defect causing the Covered Cause of Loss need not also be the "direct result of" or "solely attributable to" the Covered Cause of Loss.  If that were a requirement, there would be no need for the Serial Losses provision.

Additionally, there is no provision within the Policy which specifies that the types of losses addressed in the Serial Losses provision are subject to the definition of "One Occurrence."  The Serial Losses provision does not mention the word "occurrence" and, indeed, refers to applying "the applicable deductible," not "deductibles."  Again, to the extent the Policy is ambiguous on the issue of whether each serial loss is a separate "occurrence" subject to a separate deductible, the Court must interpret the Policy in HMV's favor.  The thirteen instances of arcing, which collectively constitute the "second loss" – second to the fire – are not separate "occurrences" to which separate deductibles apply.

Finally, the Court considers whether the Serial Losses provision covers the Business Income losses HMV incurred related to the undamaged portions of Building 98 and Buildings 87 and 129.  Part a.(1) of the Serial Losses provision applies when the Covered Cause of Loss – here, the fire – "results from a defect in design, material, manufacture, or construction."  [Filing No. 18-1 at 39.]  It is undisputed that the fire resulted from defective construction:  namely, use of the defective connectors.  Part a.(1) is satisfied.  Part a.(2) then requires that HMV have "other 'covered property' of the same type, design, material, manufacture, or construction."  Again, it is undisputed that the solar equipment on Buildings 87 and 129 is the same type as that on Building 98, and that

the same design, materials, and construction were used on all three buildings. Part a.(2) of the Serial Losses provision is therefore satisfied.

Part b. then outlines HMV's responsibilities and HSB's obligations. Part b.(1) requires that HMV promptly examine the other "covered property" to determine if it suffers from the same defect, inform HSB of the findings, and repair and eliminate the defect or replace defective parts. It is undisputed that HMV did that. Part b.(2) states that HSB will not pay for HMV's expenses to comply with Part b.(1), and HMV has not asked HSB to do so. Part b.(3) then provides that HSB will only pay 80% of the "second loss." HSB contends that, if the Serial Losses provision applies, each of the 13 arc-damaged connectors would be treated as separate losses under Part b.(3), relying mainly on the Policy's definition of "occurrence." But an "occurrence" and a "loss" under the Policy are not the same thing. The Policy does not specifically define or specify how the "second loss," "third loss," etc. should be determined, and any ambiguity must be construed in favor of HMV. *See West Bend Mut. Ins. Co.*, 598 F.3d at 921.

HSB also contends that Business Income loss related to undamaged portions of Building 98 and to Buildings 87 and 129 are excluded under the Policy's exclusion for "costs rendered necessary by defects of material workmanship, design plan, or specification." [Filing No. 18-1 at 4.] But that exclusion further provides that the "costs of replacement or rectification which is hereby excluded is only that cost which would have been incurred if replacement or rectification of the insured property had been put in hand immediately prior to the said damage." [Filing No. 18-1 at 4.] Like the Serial Losses provision, this exclusion absolves HSB from liability for fixing the defective connectors – a cost which HMV does not seek to recover under the Policy. But it does not absolve HSB from liability for Business Income loss related to remedying the defects on Buildings 87 and 129 and the undamaged portion of Building 98.

The Court finds that the Business Income losses HMV suffered as a result of the arcing on the undamaged portions of Building 98 and on Buildings 87 and 129 are covered under the Serial Losses provision as a "second loss" to the fire, and that HSB must pay 80% of that Business Income loss.[6]

### 4.    *Damages Issues*

HMV seeks summary judgment on two damages issues related to their breach of contract claim: (1) HSB's position that HMV delayed repairs on the roof of Building 98, and HSB's arbitrary deduction of amounts because of that alleged delay; and (b) HSB's position that the Policy only covers 50% of the cost of rebuilding arrays on Building 98.  The Court addresses each issue in turn.

a.    <u>Delay in Repairs to Building 98's Roof</u>

i.    **Relevant Policy Provisions**

**G.    Definitions**

\*                    \*                    \*

**20.    "Period of Restoration"**

**a.**    "Period of restoration" means the period of time that begins at the time of the Covered Cause of Loss and continues until the earlier of:

(1)    The date the direct physical damage to "covered property," "contingent property" or "utility property" is repaired or replaced; or

(2)    The date on which such damage could have been repaired or replaced with the exercise of due diligence and dispatch,

plus the number of days, if any, shown in the Declarations for Extended Period of Restoration.

---

[6] HSB also argues that overheating from the arcing was not an "accident" within the Policy's definition, nor does it constitute "direct physical damage."  [Filing No. 87 at 32.]  But there is no requirement that the arcing or resulting overheating be an accident, or that the overheating be "direct physical damage," for the Serial Losses provision to apply.

[Filing No. 18-1 at 49 (emphasis in original).]

### ii.     The Parties' Arguments

HMV argues in support of its Motion for Partial Summary Judgment that the relevant time period for the first sub-part of the "Period of Restoration" definition is April 26, 2017 to December 14, 2017, but that HSB calculated the "Period of Restoration" under sub-part (1) and "'carved out of the period [of restoration] those times when due diligence and dispatch were not exercised, including delays in ordering replacement solar array equipment,'" which amounted to 26 days of unpaid Business Income loss.  [Filing No. 92 at 48-49 (quoting Filing No. 91-1 at 266).]  HMV states that HSB's sole basis for subtracting the 26 days is that it claims HMV was dilatory in procuring solar panels and racking to replace the equipment burned in the fire because HMV did not order the equipment until September 2017 and the panels and racking were not delivered until October 2017.  [Filing No. 92 at 49.]  HMV argues that "there is no evidence that the alleged delay actually impacted the rebuild of the solar facilities on Building 98."  [Filing No. 92 at 49.]

HSB responds that it spoke with one of the vendors for the solar array replacement parts and learned that HMV did not place the order for the parts until September 11, 2017, more than four months after the fire, and that "[a]s such, HSB concluded there was a delay in ordering replacement parts of at least four months after the fire, and it called this delay to the attention of [HMV], explaining how it was treating the delay in its claim adjustment."  [Filing No. 93 at 31.]  HSB contends that its "reading of evidence developed during its investigation does not have to be accurate, it just cannot be irrational," and it was not irrational to subtract an amount to account for the ordering delay.  [Filing No. 93 at 31-32.]

HMV argues in its reply that HSB's representative testified twice during his deposition that HSB has no evidence that the alleged delay in ordering the solar array equipment "caused any interruption or actual delay of the restoration process on Building 98." [Filing No. 94 at 20.]

### iii.    Discussion

The Court has already found that the period of restoration in this case is from April 26, 2017 – the beginning of the period of Business Income loss after the fire – to December 13, 2017 – the date the roof repairs were complete and the solar equipment was reinstalled.  While HSB has presented evidence that HMV did not order the solar array equipment until four months after the fire, it has not presented evidence that the "damage [to the roof of Building 98] could have been repaired or replaced with the exercise of due diligence and dispatch," [Filing No. 18-1 at 49], at a date earlier than December 13, 2017.  [See, e.g., Filing No. 91-3 at 6 (HSB's 30(b)(6) representative testifying "Q: Okay.  Do you have any evidence that the insured ran out of equipment to reinstall on that roof that it had on hand before the Panel Claw racking showed up in early October? A:  I don't know that they ran out of any equipment.  But again, I don't remember seeing all of the equipment they would have needed to put back up on the roof either.  Q: Do you have any evidence that the insured ran out of equipment or materials to install on that roof prior to the Panel Claw racking showing up in early October?  A:  I have no evidence of that").]

Put simply, HSB has not presented any evidence that the Period of Restoration should be shortened from the April 26, 2017 to December 13, 2017 time period due to some sort of delay or lack of due diligence on HMV's part.  Accordingly, the Court **GRANTS** HMV's Motion for Partial Summary Judgment on this issue, and finds that HSB is liable under the Policy for HMV's Business Income losses associated with Building 98 for the entire time period from April 26, 2017 to December 13, 2017.

        b.       <u>Overstating Cost of Removal, Storage, and Reinstallation of Arrays</u>
<u>4, 5, and 6</u>

The Court's previous holdings are dispositive of the issue of whether HSB overstated costs associated with the removal, storage, and reinstallation of arrays 4, 5, and 6.  HMV argues that even if HSB were correct that the roof of Building 98 was not Covered Property, "it still arbitrarily deducted too much from the Miller Bros. invoices" – 50% to be exact – and "the post-fire work on Building 98 was not split 50/50 between arrays 4, 5, and 6 on the one hand and arrays 7, 8, and 9 on the other."  [Filing No. 92 at 50-51 (emphasis omitted).]  Because the Court has already held that HMV had an insurable interest in the roof of Building 98, the Policy provides coverage for the repairs to arrays 7, 8, and 9 since they were damaged in the fire, and to the removal, storage, and reinstallation of arrays 4, 5, and 6.  Accordingly, there is no need to determine whether HSB deducted too much by attributing 50% of the work to arrays 4, 5, and 6, because HSB is obligated under the Policy to pay the entire amount.  The Court **DENIES AS MOOT** HMV's Motion for Partial Summary Judgment on this issue, to the extent it finds that it has already determined that HSB is liable for the entire cost of removing, storing, and reinstalling arrays 4, 5, and 6.

      **C.**      **Bad Faith Claim**

HSB argues in support of its Motion for Partial Summary Judgment that in order to succeed on its claim for breach of the duty of good faith and fair dealing, HMV must establish by clear and convincing evidence that HSB had no legitimate basis for denying liability and that HSB engaged in "conscious wrongdoing" or had a "culpable mental state."  [Filing No. 87 at 33.]  It contends that it "performed an investigation, with the assistance of an independent consultant having the requisite experience in electrical engineering and solar energy equipment and operations, and after receiving the consultant's report it rendered its coverage determinations, including denial of liability for a portion of [HMV's] claimed losses."  [Filing No. 87 at 34.]  HSB asserts that it made

its decisions "after reviewing the documentary support [HMV] provided, conferring with [HMV's] professionals, including [HMV's] material and repair vendors, and also involving an independent accounting consultant who assisted with the review of [HMV's] claimed business income losses and prepared a measurement of loss that HSB relied on in support [of] its business income claim payments." [Filing No. 87 at 34-35.]  HSB argues that there is no evidence that it "acted with a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will to support a bad faith claim under Indiana law." [Filing No. 87 at 35.]

HMV responds that it has presented sufficient evidence to support its bad faith claim. [Filing No. 92 at 51.]  It argues that a preponderance of the evidence standard applies, and points to evidence that: (1) HSB did not conduct a full, fair, and reasonable investigation into the application of the Serial Losses provision and the insurable interest issue; (2) HSB purposefully made arbitrary deductions and unreasonably delayed payment of undisputed amounts; and (3) HSB denied coverage in order to force HMV to sue the contractors because HSB did not have subrogation rights so could not do so itself.  [Filing No. 92 at 53-60.]

In reply, HSB argues that failure to conduct a full and fair investigation is not a sufficient basis for a bad faith claim and that, in any event, "it is not bad faith for HSB to have treated a policy condition [the Serial Losses provision] included for its own benefit in the way that it did here, when it is not a coverage granting clause in the first instance and does not otherwise produce coverage for [HMV] when properly interpreted in the context of the whole policy." [Filing No. 93 at 32-33.]  HSB argues further that it did consider the insurable interest issue.  [Filing No. 93 at 33-34.]  It also contends that "the record does not corroborate [HMV's] accusations of delay, and certainly does not show HSB caused an unfounded delay in making payment, as [HMV] is required to prove." [Filing No. 93 at 34 (emphasis omitted).]  Finally, it argues that there is no

evidence that the absence of subrogation had any effect on HSB's coverage determinations.  [Filing No. 93 at 34.]

Indiana law recognizes a cause of action for an insurer's breach of its duty to deal with its insured in good faith.  *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993).  This duty of good faith includes, but is not limited to, the obligation to "refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of [its] claim." *Id.*; *see also Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) ("[A]n insurer's duty to deal in good faith with its insured encompasses more than a bad faith coverage claim").  The duty is not breached merely because an insurer denies a claim, even if it is later determined that the insurer breached the contract.  *Erie Ins. Co.*, 622 N.E.2d at 520.  The duty is also not breached by a lack of diligent investigation.  *Id.*  Rather, the duty is breached when the insurer "denies liability knowing that there is no rational, principled basis for doing so." *Id.*

A finding of bad faith "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guar. Ins. Co.*, 829 N.E.2d at 977 (internal quotations and citation omitted).  Intent is a factual issue that can be proved by circumstantial evidence. *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 41 (Ind. Ct. App. 1999) ("[A] final determination of the significance of all of the evidence presented by [the insured] is a question for the jury").

As a preliminary matter, although it is possible for an insurer to erroneously deny or limit a claim without breaching its duty of good faith, the inverse is not true.  In other words, in order for HMV to prevail on a claim that HSB breached its duty of good faith and fair dealing by issuing a claim decision that it knew was irrational or unfounded, HMV would need to establish both that

HSB's limiting of the claim was a breach of the Policy, and that HSB had the requisite knowledge and intent. *See Erie Ins. Co.*, 622 N.E.2d at 520; *Monroe Guar. Ins. Co.*, 829 N.E.2d 977. HMV has made the first showing, and the Court has determined that HMV is entitled to summary judgment on its breach of contract claim.

As to the second showing, only HSB moves for summary judgment on the bad faith claim. HMV did not do so, presumably because disposition of that claim depends on the resolution of factual issues that are disputed by the parties. HMV has presented evidence, undisputed by HSB, that HSB did not thoroughly analyze the claim, including but not limited to evidence that:

- The first adjuster to review the claim, Mr. Henderson, testified that he did not review the Serial Losses provision and its potential applicability to HMV's claim, [Filing No. 91-4 at 10];

- The second adjuster to review the claim, Mr. Smith, did not respond to HMV's request for Serial Losses coverage, [Filing No. 91-2 at 4];

- HSB did not mention the Serial Losses provision in its coverage position letters from June 27, 2017, October 27, 2017, and May 30, 2018, [Filing No. 91-1 at 68-73; Filing No. 91-1 at 133-40; Filing No. 91-1 at 147-48];

- The Claim File Notes, the Large Loss Notice, and the Case Status Reports do not mention the Serial Losses provision, [Filing No. 91-1 at 6-7; Filing No. 91-1 at 38-63; Filing No. 91-1 at 109-114];

- HSB did not consider the *Erie-Haven* case (despite HMV notifying it of the case), or other legal precedent, in reaching its conclusion that HMV did not have an insurable interest in the roof of Building 98, [Filing No. 91-1 at 87-88; Filing No. 91-1 at 176-77; Filing No. 91-4 at 6-7; Filing No. 91-4 at 9]; and

- HSB deducted 26 days from the Business Income loss coverage related to the ordering of equipment needed to rebuild arrays 6, 7, and 8 without any evidence that the delay in ordering the equipment caused any delay in rebuilding the Solar Project on the roof of Building 98, [Filing No. 91-3 at 6-7].

HMV has also presented evidence that HSB delayed in making payments, including but not limited to:

- HSB approved payment for an invoice on October 27, 2017, but did not reimburse HMV for the invoice until November 2018, [Filing No. 91-1 at 5; Filing No. 91-1 at 138];

- HSB acknowledged in May 2018 that it owed HMV $538,000, but did not actually make payment until November 2018, [Filing No. 91-1 at 5; Filing No. 91-1 at 157-58];and

- HSB determined that the additional $71,143 for the Extended Period of Restoration was owed as early as November 2, 2018, but did not pay HMV until March 2019 and noted in claim notes that the claims adjuster could propose HMV settle its entire Business Income loss claim for all three buildings for the $71,143 amount, [Filing No. 91-1 at 39; Filing No. 91-5 at 5].

Finally, HMV has presented evidence that there is an anti-subrogation provision in the Construction Agreement between Inovateus and HMV which prohibits HSB from recovering from the Solar Project contractors.  [Filing No. 91-5 at 98 ("[HMV] waives all rights of subrogation against [Inovateus] and subcontractors (of any tier), for damages caused by fire or other causes of loss to the extent covered by builder's risk insurance…or other property insurance…. This waiver will extend to property insurance insuring the completed Projects after Final Completion").]  While the parties disagree as to the implications of this provision, it is a fact that a reasonable jury could rely on it to conclude that it provided motivation for HSB to deny coverage.

In short, HMV has presented evidence from which a reasonable jury could conclude that HSB acted in bad faith during the handling of HMV's claim, and that HMV is entitled to punitive damages.[7]  This evidence is enough to create a genuine issue of material fact, and to withstand summary judgment.  Accordingly, the Court **DENIES** HSB's Motion for Partial Summary Judgment on HMV's bad faith claim.

---

[7] HSB objects to the opinions of HMV's claims handling expert, James Schratz, relating to whether HSB acted in bad faith in handling HMV's claim.  [Filing No. 93 at 4.]  Because the Court has not relied on the opinions of Mr. Schratz in connection with the Motions for Partial Summary Judgment, the Court **OVERRULES AS MOOT** HSB's objections to Mr. Schratz's opinions at this time.

**IV.**
**CONCLUSION**

For the foregoing reasons, the Court:

- **DENIES** HSB's Motion for Partial Summary Judgment, [86]; and

- **GRANTS** HMV's Motion for Partial Summary Judgment, [91], to the extent it finds that:

  o HSB breached the Policy by failing to pay HMV for all costs attendant to repairing the roof of Building 98 and the Solar Project thereon;

  o HSB breached the Policy by failing to pay HMV for its Business Income losses associated with the shut-down of the Solar Projects on Building 87, Building 129, and the portion of Building 98 not directly damaged by the fire pursuant to the Serial Losses provision; and

  o HSB breached the Policy by failing to pay HMV for HMV's Business Income losses associated with Building 98 for the entire time period from April 26, 2017 to December 13, 2017.

- **DENIES AS MOOT** HMV's Motion for Partial Summary Judgment, [91], to the extent it declines to determine whether HSB deducted too much by attributing 50% of the work to arrays 4, 5, and 6, because HSB is obligated under the Policy to pay the entire amount.

HMV's claim for breach of the duty of good faith and fair dealing, including its claim for punitive damages, will proceed. No partial final judgment shall issue. The Court requests that the Magistrate Judge confer with the parties as soon as practicable regarding an agreed resolution of HMV's remaining claim short of trial.

Date: 8/13/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**